**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| J.W., an individual; | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Docket No.: _______________ |
| v. | ) | |
| | ) | *Plaintiff Demands* |
| KINZA INC. d/b/a Days Inn, | ) | *a Trial by Jury* |
| | ) | |
| Defendant. | ) | |

# COMPLAINT


Matthew B. Stoddard
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
F: 470-467-1300
matt@legalhelpga.com

***Attorney for Plaintiff***

**TABLE OF CONTENTS**

Introduction .......... 3

Procedural Issues and Parties .......... 7

Facts .......... 10

A. Plaintiff's Trafficking. .......... 10

B. Information Regarding Defendant's Motel, and Plaintiff's Experience Not Being Unique. 16

C. Common Policies and Procedures .......... 18

D. Defendant's Knowledge as to Plaintiff. .......... 20

COUNT 1: TVPRA Civil Beneficiary Claims .......... 23

COUNT 2: Premises Liability Law .......... 26

Causation and Damages .......... 29

Prayer for Relief .......... 30

## INTRODUCTION

1.

This case involves the sex trafficking of a minor, Plaintiff J.W., at a notorious Charlotte motel.

2.

The motel at issue is the Days Inn that was located at 1408 W Sugar Creek Road, Charlotte, North Carolina (the "Motel," the "Days Inn," or "Defendant's Motel").

3.

At all relevant times to this Complaint, Defendant KINZA INC. owned, operated, and managed the Days Inn.

4.

For years Sugar Creek Road has been known as having a reputation for drugs, prostitution, and sex trafficking, and while in operation, Defendant's Motel, which was located along the notorious stretch of roadway, was a known hotspot for these types of illegal activities.

5.

At only seventeen years old, J.W. was trafficked for sex at the Days Inn by a man she knew as Michael Mahall and his associates from approximately October 1, 2016, through March 31, 2017.

6.

Prior to J.W.'s trafficking, Defendant was aware of its reputation. Despite its knowledge, Defendant refused to take any action to deter the criminal activity happening on its property thereby creating a safe space for those seeking to commit crimes without fear of detection or consequence. Defendant then profited off of the increased room rentals this system created (i.e. creating a safe space for drug trafficking, human trafficking, commercial sex, and other crime).

7.

Upon information and belief, Defendant was warned on numerous occasions prior to and during Plaintiff's trafficking by law enforcement, Motel patrons, and the overwhelming and unignorable presence of crime at the Days Inn that said location was a haven for drugs, prostitution, sex trafficking, and other violent crime. As but one example:

9/3/26, 5:54 PM DAYS INN CHARLOTTE NORTH-SPEEDWAY-UNCC-RESEARCH PARK - Motel Reviews (NC)

**crystalgizmo21** •••

wrote a review Aug 2016

Wilmington, North Carolina1 contribution

●○○○○

**HORRIBLE! UNSAFE!**

HORRIBLE!!! UNSAFE!!!
Had several guys approach offering if I like to make some money everytime I stepped out of room.
PROSTITUTION! DRUGS! VIOLENCE! DON'T STAY!
Managers not helpful. Scary Staff! Got blocked in our parking spot and manager told us to go knocking on everyones door to see who it belonged too. Rooms well they had a bed that is the only good thing I could say. Pool was brown. Doesn't look like it is opened this year.

**Cleanliness**
●○○○○

**Service**
●○○○○

**Sleep Quality**
●●●○○

Date of stay: **August 2016**

8.

Given the above, Defendant knew or should have known that changes had to be made at the Days Inn. However, instead of contacting law enforcement, hiring appropriate security, or taking other reasonable measures to deter crime, Defendant chose to profit from the room revenues brought in by those seeking to commit crime(s) and provide cover for criminals seeking a place free of repercussions.

9.

As a direct and foreseeable result of Defendant's actions and inactions, the then-minor Plaintiff in this case was brought to Defendant's Motel to be trafficked, beaten, threatened, and repeatedly raped.

10.

Defendant had every reason to know about what was happening to J.W. and that it was facilitating her trafficking. For instance, during J.W.'s time at Defendant's Motel:

a. Plaintiff was only 17 years old. She had little to no belongings and was always dressed in provocative, age-inappropriate clothing.

b. Plaintiff was at the Days Inn for approximately 60 days between October 1, 2016, and March 31, 2017, and while she was the age of someone who should have been in school, she was present at the Motel each day.

c. Plaintiff accompanied her trafficker to the front desk area where her trafficker would pay for a room or rooms at Defendant's Motel using the cash that Plaintiff had generated through commercial sex acts.

d. Defendant would purposefully place Plaintiff and her trafficker in rooms that were in the same area as other men and women who were involved in commercial sex activity.

e. Plaintiff's trafficker would sometimes send Plaintiff on her own to rent the rooms using a fake I.D. that he had given her, which bore little to no resemblance to Plaintiff.

f. Each time Plaintiff would be at the front desk of the Days Inn, she exhibited the well-known signs of a trafficking victim, including being dressed in little or revealing clothing, appearing under the influence of drugs and alcohol, and having signs of physical abuse.

g. On those occasions where Plaintiff would see her trafficker interact with Motel staff, they were very friendly.

h. Motel staff would even allow Plaintiff and her trafficker to pay for the room after the check-out time of 11:00 a.m. without having them removed from the property, which allowed Plaintiff's trafficker to collect additional funds from Plaintiff's sex trafficking to pay for the room.

i. Plaintiff's trafficker would arrange for approximately 10 to 15 men per day to come to the Days Inn to pay for sex with Plaintiff.

j. Each day, many men would drive into the Motel's parking lot, park near Plaintiff's room, walk into Plaintiff's room, and stay for only 20 to 30 minutes before leaving and driving out of the parking lot in full view of Motel staff.

k. Some of these men would even park behind cars for their short visits making it where other guests could not leave the Motel.

l. Plaintiff's trafficker would exit the room each time these men arrived and would simply stand outside directly beside the door in full view of Motel staff until the transaction was completed.

m. In addition to Plaintiff, there would always be at least two other females, one who was also a minor, under the control of Plaintiff's trafficker and his associates during J.W.'s time at Defendant's Motel.

n. Housekeeping would be working around the Motel while men were coming and going to Plaintiff's room, and Plaintiff made eye contact with housekeeping repeatedly while allowing men into her room.

o. Plaintiff's trafficker, or Plaintiff at her trafficker's explicit direction, would stop housekeeping when housekeeping was servicing rooms near Plaintiff's room and ask for specific items needed like towels and toiletries to prevent housekeeping from coming inside the room. This would result in the room going multiple days without housekeeping ever entering it.

p. On the few occasions that housekeeping did access the rooms to clean them, there would be drugs and drug paraphernalia out in plain sight; housekeeping would leave the items undisturbed.

q. Plaintiff's trafficker would loudly assault and argue with Plaintiff such that employees of the Days Inn could hear said events.

r. The Days Inn staff often would not call the police despite having information that crimes were occurring at the property.

11.

In short, Defendant profited not just from the room rentals of the general criminal element it attracted with its policies, Defendant also knew or should have known that it was profiting from the sex trafficking of then-minor J.W. With that knowledge, Defendant aided in providing J.W.'s trafficker and his associates a safe space to operate that catered to their needs. As such, Defendant is liable for J.W.'s damage under 18 U.S.C. § 1595(a) (the "TVPRA") and North Carolina's premises liability law.

## PROCEDURAL ISSUES AND PARTIES

12.

Given the nature of the case, J.W. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel will disclose her full name to defense counsel immediately upon identification of defense counsel. Separately, Plaintiff will file a Motion to

Proceed by Pseudonym seeking Court permission for Plaintiff to proceed anonymously once defense counsel is identified and Plaintiff's counsel has had an opportunity to confer with defense counsel as required by local rule.

13.

J.W. is a natural person who is currently a resident and citizen of the State of Georgia; she consents to the jurisdiction of this Court.

14.

Defendant KINZA INC. is registered as a Pennsylvania corporation with its principal place of business at 4746 Spruce Street, Philadelphia, Pennsylvania, 19139.

15.

Defendant KINZA INC. owned, operated, and managed the Days Inn from November 19, 2012, through at least October 24, 2018.

16.

After applying for its Certificate of Authority in North Carolina, having its Certificate of Authority revoked twice, and being suspended twice by the North Carolina Department of Revenue, Defendant KINZA INC. was reinstated by the North Carolina Secretary of State on May 16, 2016.

17.

Defendant KINZA INC. then filed its Application for Certificate of Withdrawal on October 25, 2019, consenting to service of process on the North Carolina Secretary of State, and identifying 2809 Spring Forest Road, Suite 201, Raleigh, North Carolina, 27616, as the address for mailing any process received by the North Carolina Secretary of State.

18.

As a result, Plaintiff is serving the North Carolina Secretary of State with a copy of this Complaint and the Summons as permitted under G.S. § 55D-33.

19.

Ejaz Shareef, President of Defendant KINZA INC., resides and can be served at 193 Billows Drive, Mount Royal, New Jersey, 08061.

20.

Rafid Latif, Vice President of Defendant KINZA INC., resides and can be served at 250 Willis Avenue, Syosset, New York, 11791.

21.

As such, Defendant KINZA INC. was properly served with process in this matter.

22.

Defendant KINZA INC. is subject to the jurisdiction and venue of this Court.

23.

Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595, which is a law of the United States.

24.

Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Mecklenburg County, North Carolina, which is within the Western District of North Carolina. *See* 28 U.S.C. § 1391.

# FACTS

**A. Plaintiff's Trafficking.**

25.

In or around September 2016, seventeen-year-old J.W., who was living with her mother in Concord, North Carolina, met a man named Michael Mahall ("Michael") on the website Plenty of Fish.

26.

Plaintiff and Michael began talking regularly online, and about two or three weeks after their first online interaction, Michael came to visit Plaintiff at the fast-food establishment where she worked.

27.

Right around the time Plaintiff met Michael in person, Plaintiff told Michael about financial struggles she was experiencing, and Michael offered to help her.

28.

Michael told Plaintiff that he was going to give her a "job" where she would receive a lot of money, but he did not provide any details regarding what the "job" would require.

29.

Michael immediately began selling then-minor Plaintiff out of motel rooms in Charlotte, North Carolina for sex.

30.

From approximately October 1, 2016, until March 31, 2017, Michael trafficked Plaintiff out of two motels on Sugar Creek Road, one of which was Defendant's Motel.

31.

As soon as Michael started trafficking Plaintiff, he began giving her drugs, including cocaine and ecstasy. These drugs were meant to assist Plaintiff with the demands of being sold for sex multiple times a day and to make her more agreeable to Michael's demands.

32.

To meet "johns" – the term commonly used for those who purchase commercial sex – Michael posted online advertisements of Plaintiff on websites like Backpage.com.

33.

Johns would then contact Michael via phone, and he would direct them to a motel room that he had rented for the purpose of trafficking Plaintiff for sex. These rooms would often be at Defendant's Motel.

34.

Defendant collected revenue from the rental of rooms to Michael and his associates in which J.W. was forced to have sex multiple times a day.

35.

Motel staff would intentionally rent Plaintiff and Michael rooms in an area of the Motel where other men and women who were participating in commercial sex activity were renting rooms.

36.

The johns would drive into the parking lot of Defendant's Motel, pass the front desk, and park in the area where Plaintiff's room was. The johns would then enter Plaintiff's room, and Plaintiff's trafficker would step outside and wait by the door until the "date" was completed about 20 to 30 minutes later.

37.

This process would take place at least ten times each day Plaintiff stayed at Defendant's Motel.

38.

When opening the door of the room to allow the john in, Plaintiff would sometimes make eye contact with housekeeping, who continued to go about their jobs despite a man much older than Plaintiff being allowed in her room and another man who was also older than Plaintiff standing "guard" right outside of her room.

39.

Moreover, Plaintiff or her trafficker would always stop housekeeping in the area of their room, but before housekeeping could reach their room for service, to ask for items they needed like towels and toiletries, to ultimately prevent housekeeping from entering the room.

40.

Housekeeping would not enter Plaintiff and her trafficker's room for days, and during at least one of their stints at Defendant's Motel, housekeeping did not enter the room for a full two weeks.

41.

On the few occasions when housekeeping did enter the room to clean it, there would be drugs and drug paraphernalia sitting out in plain view for housekeeping to see. Housekeeping would simply leave the drugs and drug paraphernalia where they originally were, undisturbed.

42.

Michael worked with another pimp, and during the time Michael was trafficking Plaintiff for sex, he was also trafficking two other females.

43.

Accordingly, this same process of men passing the front desk and coming and going from rooms where they would stay for a short period of time was repeated for the two other girls.

44.

Plaintiff was required to give the money to Michael as soon as a date was completed, and he would even check her phone to ensure she was not holding onto any money she had received from the transactions.

45.

Michael would then use part of the funds that J.W. had made from the sex acts to rent or re-rent the motel rooms at the Days Inn.

46.

Not long after Michael began trafficking Plaintiff, Plaintiff asked Michael to stop being sold for sex, but he refused and became even more violent towards her.

47.

Michael and Plaintiff would get into loud arguments or physical altercations on the property, which, upon information and belief, could be heard by others, including staff at Defendant's Motel.

48.

Michael would use, or threaten to use, acts of violence against Plaintiff to keep her under his control and force her to engage in commercial sex.

49.

Plaintiff learned she must follow Michael's rules to avoid getting beaten by him, and she tried her best to avoid doing anything that may invoke his wrath.

50.

At the beginning of their stays at Defendant's Motel, Plaintiff would accompany Michael to the front desk to re-rent the rooms he was using to traffic Plaintiff.

51.

Eventually, Michael began directing Plaintiff to go to the front desk of Defendant's Motel to rent rooms for the sex trafficking. He provided her with a portion of the funds from the sex trafficking and a fake I.D. for the rental because she was a minor at the time.

52.

The fake I.D. Michael provided Plaintiff did not resemble Plaintiff, but the Days Inn staff asked no questions. Instead, they simply accepted the cash she provided and rented her a room.

53.

If neither Michael nor Plaintiff came to the front desk to re-rent the room by check-out time, Defendant would not ask them to leave or have them removed from the property for non-payment. Instead, Defendant would allow Michael and Plaintiff to come in later to pay for the room after additional commercial sex activity had been completed to obtain the room rental money.

54.

Plaintiff would also linger in the parking lot of the Days Inn speaking with men much older than her while wearing little or revealing clothing.

55.

J.W. exhibited numerous, well-known, and visible signs of a sex trafficking victim during the period she was at the Days Inn. These included, but were not limited to:

a. J.W. was visibly young and the men she was with were much older than her;

b. J.W. was frequently wearing clothing that was inappropriate for her age, including little or revealing clothing;

c. J.W. had signs of drug use and physical injury;

d. There was heavy foot traffic to, from, and in front of the rooms where J.W. was staying, with adult men entering and staying 20-30 minutes before leaving the premises entirely;

e. J.W.'s trafficker, his associates, and J.W. at her trafficker's direction would rent rooms by the day, always paying in cash;

f. J.W., who was a young girl, would come to the lobby to re-rent the room that was originally rented by an older man, use an identification card that did not look like her, rent the room by the day, and pay in cash; and

g. The rooms where J.W. stayed were filled with used condoms.

56.

Seventeen-year-old J.W. was forced to have sex for money over hundreds of times with numerous men in rooms at the Days Inn.

57.

J.W.'s victimization followed a pattern that was readily observable and should have been obvious to Days Inn employees based on information available to the public at large and to the hotel industry and information available to Defendant's Motel specifically, and consequently, Defendant and its employees and agents had constructive knowledge of J.W.'s trafficking.

## B. Information Regarding Defendant's Motel, and Plaintiff's Experience Not Being Unique.

58.

Defendant and its employees knew that drug crime and commercial sex were commonplace not only on Sugar Creek Road, but also at the Days Inn specifically.

59.

In 2015, just a little over a year before Plaintiff was trafficked at the Days Inn, the Charlotte-Mecklenburg police officers were targeting the "hotel corridor" on Sugar Creek Road and identified the area as "a problem. . . as it relates to human trafficking and prostitution."[1]

60.

In November 2016, during the period Plaintiff was trafficked at the Days Inn, three teenagers who were connected to a burglary fled to the Days Inn to hide out, and a standoff with police ensued.[2]

61.

Online customer reviews of the Days Inn reported criminal activity, including specifically drug and commercial sex activity on the property. These included reviews like the following:

a. ". . . I think he **rents the rooms to lots of sex workers** [] and homeless people. . .. I felt dirty and unsafe during my two nights here." (TripAdvisor, May 2016);

b. "**Need to hire off duty police** to patrol the area from 6pm to 6am to **curb the prostitutes and drug dealers**." (TripAdvisor, August 2016);

---

[1] https://www.wsoctv.com/news/local/cmpd-9-busted-north-charlotte-prostiution-ring/52870608/ (last visited Sept. 10, 2026).

[2] https://www.wcnc.com/article/news/crime/teens-charged-following-standoff-against-swat/275-353981239 (last visited Sept. 10, 2026).

c. “There was constant traffic, **illegal activity** and the staff wasn’t to [*sic*] friendly.” (TripAdvisor, August 2016);

d. “HORRIBLE!!! UNSAFE!!! Had several guys approach offering if I like to make some money everytime [*sic*] I stepped out of room. **PROSTITUTION! DRUGS! VIOLENCE!** DON’T STAY!” (TripAdvisor, August 2016);

e. “Go to another hotel. Do not stay here. **This Days Inn has so many prostitutes and crack heads lingering at all times of the night**.” (TripAdvisor, September 2016);

f. “I’m guessing the people that left positive reviews are t**he prostitutes and drug dealers we saw** from the room and as we were loading up our things.” (TripAdvisor, September 2016);

g. “. . . at night we would not dare come out of our room! **People were congarated [*sic*] everywhere~partying**. . .. I saw **drug deals~prostitutes** etc.” (TripAdvisor, September 2016);

h. “. . . I saw several questionable people pull up in cars and beep there [*sic*] horn. Then **I saw money exchange for a small delivery** of not sure what but can only speculate. **I was also propositioned on 3 different occasions** by questionable females walking around the hotel.” (TripAdvisor, October 2016);

i. “There was a **bullet mark** on the front window” (TripAdvisor, November 2016);

j. “later in the evening there was a. . . person upstairs either break-dancing or moving furniture all night. Likely while going through **withdrawal from crack**.” (TripAdvisor, November 2016);

k. “It’s also in a **very high crime area**.” (TripAdvisor, December 2016);

(emphasis added in bold; all other emphasis in original).

62.

Defendant, or someone on Defendant's behalf, would respond to reviews.

63.

Plaintiff also witnessed abundant criminal activity occurring on the property each time she was at the Days Inn.

64.

Plaintiff observed many other females on the property of the Days Inn who appeared to be participating in commercial sex activity based on their attire and demeanor.

65.

Plaintiff also observed drug sales happening in the parking lot, and she saw at least one robbery occur at the Motel.

66.

In short, the illegal activity at the Days Inn was so pervasive that it would have been impossible for Defendant's staff not to notice these activities.

**C. Common Policies and Procedures**

67.

To facilitate and cater to the criminal element at its Days Inn, Defendant engaged in the following behaviors and procedures:

a. Defendant placed those participating in commercial sex activity in one area of the Motel together;

b. Defendant continued to rent rooms to those it knew or should have known were engaged in sex trafficking, prostitution, and drug activity;

c. Defendant violated its own policies and procedures by allowing guests to refuse housekeeping for multiple days in a row;

d. Defendant maintained policies and systems whereby it would not call the police on those it knew or should have known were engaged in sex trafficking, drug sales, and prostitution, thereby providing an environment where one could engage in sex trafficking without fear of detection or repercussion(s);

e. Defendant maintained policies and systems whereby guests could use fake identification to obtain rooms, thereby allowing underage girls to obtain rooms, which further facilitated pimps and traffickers to conduct their business; and

f. Upon information and belief, Defendant maintained policies and systems whereby it would allow and even encourage guests to pay for rooms day-by-day and in cash to cater to the needs of traffickers, who would only deal in cash.

68.

Despite warnings from prior customer complaints and apparent crime on the property that included drug sales in the parking lot, pimps monitoring rooms, and women selling themselves in the parking lot, Defendant did not change its policies and systems at the Days Inn.

69.

Defendant maintained the policies and systems described above to create an environment of low disruption and detection for criminality, to continue to attract those who would rent rooms to engage in illegal activity (like sex trafficking, drug use, and prostitution), and for the purpose of profiting from the rooms rentals. These policies were applied to J.W.'s trafficker and his associates.

70.

Defendant maintained the above policies and systems and provided Plaintiff's trafficker a friendly welcome despite numerous warnings and red flags about both Plaintiff individually and the Days Inn as a whole, thereby facilitating and participating in Plaintiff's sex trafficking, providing a venue where Plaintiff's sex trafficking could occur, and creating a tacit agreement between Defendant and Plaintiff's trafficker to profit from a sex trafficking operation that all knew or should have known about.

**D. Defendant's Knowledge as to Plaintiff.**

71.

Defendant directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at the Days Inn at all relevant times, giving Defendant specific and direct knowledge of sex trafficking, including the sex trafficking that victimized J.W., and other crimes at the Days Inn during the relevant period.

72.

Defendant utilized, monitored, and reviewed cameras at the Days Inn at all times relevant to this Complaint.

73.

Defendant and its employees were warned by the online reviews, customer complaints, and law enforcement activity at the property of the high presence of drug sales, prostitution, and violent crime at the Days Inn prior to J.W.'s trafficking period.

74.

Defendant knew or should have known that other women displayed the same signs of trafficking at its Motel prior to J.W. being there. However, Defendant similarly profited from said women.

75.

Defendant knew or should have known that Michael and his associates were frequently at its Motel with young women and girls.

76.

Defendant knew or should have known that J.W. displayed the following signs of sex trafficking at all times relevant to this Complaint:

a. Plaintiff was dressed provocatively for her age, and she often appeared under the influence of drugs;
b. Plaintiff had signs of physical injury and was often not well-groomed;
c. Plaintiff was almost always with men much older than her;
d. Plaintiff and her trafficker would meet housekeeping at their cart for items rather than letting them in the room;
e. Plaintiff's trafficker would arrange for no less than 10 men per night to drive past the front office in clear view of Defendant's employees, park in the parking lot, stay at Defendant's Motel less than an hour while they had sex with J.W., before once again driving past the front desk in clear view as they left;
f. Plaintiff's trafficker would wait right outside of Plaintiff's room for her to finish with the johns before re-entering the room; and
g. Plaintiff's trafficker would become angry and abusive towards Plaintiff, and yell or be violent, in a manner that others, including Defendant's staff, could hear.

77.

Defendant knew and should have known that its Motel was the subject of:

a. Multiple women soliciting themselves in the parking lot;

b. Persons selling drugs in the parking lot;

c. Persons doing drugs in the rooms;

d. The pervasive smell of marijuana throughout both the Motel and parking lot; and

e. Cars with johns coming, going, and passing the front desk after spending only 20 to 30 minutes at the Motel at all hours of the night. This was not limited to those men coming to have sex with Plaintiff. Rather, other women were sold at the Motel as well, which – in addition to drug sales – created a high traffic environment that no one could miss.

78.

Defendant knew and should have been aware that the above are signs of trafficking in the hospitality industry such that it knew or should have known of Plaintiff's trafficking.

79.

Defendant knew and should have known that there were reviews online and customer complaints stating there are drug sales at the Days Inn and prostitutes soliciting themselves openly in the parking lots.

80.

Defendant knew and should have known about the high amount of prostitution and drug sales at its Motel because of the frequency with which law enforcement was on the property.

81.

Defendant should have known that by failing to correct or warn of the condition at its property (i.e., allowing crime to reign freely and without consequence for the sake of profit), Plaintiff's trafficking was foreseeable.

## COUNT 1: TVPRA CIVIL BENEFICIARY CLAIMS

82.

The TVPRA provides a civil cause of action to victims like J.W. against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter. . ." 18 U.S.C. § 1595.

83.

Defendant "knowingly benefited" from J.W.'s trafficking because:

a. Plaintiff's trafficker and his associates rented rooms at Defendant's Motel; and

b. Defendant collected revenue from the room rentals by accepting payment for said rooms.

84.

Defendant took part in a common undertaking involving risk or profit with the Plaintiff's trafficker and his associates because:

a. Defendant directly rented rooms to Plaintiff's trafficker and his associates for which Defendant received money and/or United States currency;

b. Plaintiff's trafficker and his associates would pay in cash for one night at a time, booking the next night's stay before checking out;

c. Defendant directly rented rooms to Plaintiff's trafficker and his associates when Defendant knew or should have known that Plaintiff's trafficker and his associates were engaged in sex trafficking J.W.;

d. Defendant directly rented rooms to Plaintiff when Defendant knew or should have known she was underage and she was being sold for sex out of the rooms;

e. Defendant purposefully placed Plaintiff and her trafficker in rooms in the area of the Motel where it placed other men and women participating in commercial sex activity;

f. After renting rooms to Plaintiff, her trafficker, and his associates, when Defendant knew or should have known Plaintiff's trafficker and his associates were engaged in sex trafficking J.W., Defendant continued its business relationship with Plaintiff's trafficker and his associates by continuing to rent rooms to them while Defendant knew or should have known Plaintiff's trafficker and his associates were engaged in sex trafficking J.W.;

g. Defendant had a continuous business relationship with J.W.'s trafficker and his associates such that Defendant established a pattern of conduct with those traffickers;

h. After renting the room for the first night, J.W.'s trafficker and his associates had prior commercial dealings with Defendant and then reinstated those dealings;

i. Defendant associated with Plaintiff's trafficker and his associates in an effort to force J.W. to serve Defendant's business objectives;

j. Defendant allowed Plaintiff and her trafficker to stay in the room after the standard check-out time without paying the rental fee in an effort to give them time to make the money for the room through the sex trafficking activity;

k. Upon information and belief, Defendant instructed staff not to call the police about crime and criminal acts on the property;

l. Upon information and belief, the Days Inn had policies and procedures requiring housekeeping to check each room at least every other day, but Defendant chose to violate these policies and procedures to further assist J.W.'s trafficker in avoiding detection; and

m. Defendant owned, operated, and maintained the Days Inn in question.

85.

Plaintiff's trafficker's undertaking with Defendant violated the TVPRA with respect to Plaintiff J.W. because:

a. Plaintiff's trafficker forced her to participate in commercial sex acts at Defendant's Motel by, among other reasons, assaulting her and threatening her with acts of violence against her;
b. Plaintiff's trafficker harbored J.W. at the Days Inn owned by Defendant for the purpose of J.W. participating in commercial sex acts at the property;
c. Plaintiff's trafficker transported J.W. to the Days Inn owned by Defendant for the purpose of J.W. participating in commercial sex acts on the property;
d. Plaintiff's trafficker kept Plaintiff under his control and in a repeated pattern of having to participate in commercial sex acts at Defendant's Motel, by among other reasons, keeping Plaintiff under the influence of drugs;
e. the commercial sex acts occurred at Defendant's Motel within its rooms that were rented by J.W.'s trafficker and his associates;
f. Plaintiff's trafficker used force, threats of force, fraud, and coercion to cause J.W. to participate in commercial sex acts at Defendant's Motel;
g. Plaintiff's trafficker knowingly recruited, enticed, harbored, transported, advertised, maintained, and solicited J.W. to engage in commercial sex acts in Defendant's Motel rooms that he rented from Defendant;
h. buyers came to Defendant's Motel, purchased the "right" to have sex with J.W. from her trafficker, and then the buyers raped J.W. at Defendant's Motel;
i. Plaintiff's trafficker was aware that J.W. was not yet eighteen years of age but nevertheless sold her for commercial sex at Defendant's Motel;
j. Defendant provided the room where the trafficking occurred and participated in the venture; and

k. Other actions to be proven at trial.

86.

The venture in which Defendant participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of interstate highways to transport J.W. to Defendant's Motel, and other reasons to be proven at trial.

87.

As shown above, Defendant had – at minimum – constructive knowledge that J.W. was being trafficked for sex at its Motel.

88.

Defendant directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at the Days Inn at all relevant times, giving Defendant specific and direct knowledge of sex trafficking, including the sex trafficking that victimized Plaintiff, and other crimes at the Days Inn during the relevant period.

**COUNT 2: PREMISES LIABILITY LAW**

89.

Defendant owed a duty to Plaintiff J.W. to exercise ordinary care in keeping the premises and approaches of the Days Inn safe.

90.

Defendant had actual and constructive knowledge of criminal activity at its Days Inn that made the repeating sexual assault of seventeen-year-old J.W. foreseeable to Defendant.

91.

Defendant knew or should have known of steps to take to prevent the Days Inn from being used as a venue for sex trafficking, rape, forced drug use, assault, and other crimes perpetrated against J.W. but negligently failed to correct the conditions or warn J.W.

92.

Defendant was negligent and said negligence proximately caused Plaintiff J.W.'s injuries in the following ways:

a. failing to use ordinary care to keep the premises safe;

b. negligently failing to provide appropriate and effective security personnel during Plaintiff's sex trafficking at the Days Inn;

c. negligently failing to properly inspect and maintain the premises;

d. negligently failing to properly train and supervise its employees regarding sex trafficking and other sex crimes at the Days Inn;

e. negligently failing to properly retain, hire, train, and supervise said employees;

f. negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

g. negligently failing to respond to online reviews and publicly available information;

h. negligently failing to prevent loitering, pandering, prostitution and trespassing;

i. negligently failing to remove loiterers, panderers, prostitutes, pimps and trespassers;

j. negligently failing to inspect, patrol, or appropriately monitor the property;

k. negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage,

patrols, inspections, physical, and other landscaping adjustments, and other measures available;

l. negligently failing to remediate a long history of crime at the Days Inn;

m. negligently failing to warn invitees of known hazards at the property;

n. negligently representing to invitees that the property was safe; and

o. other negligent acts that violated North Carolina common law to be proved at trial.

93.

Defendant also had a duty NOT to aid in the creation of, and NOT to maintain, a continuous and regularly repeated dangerous criminal condition at the Days Inn.

94.

Defendant was aware of the dangerous criminal condition at the Days Inn and negligently allowed that condition to continue.

95.

Defendant maintained a dangerous, criminal condition at the Days Inn, which caused J.W. to be repeatedly sexually assaulted and raped at the Motel, and J.W. seeks to recover for that sexual abuse.[3]

[3] Under G.S. § 1-17, "a plaintiff may file a civil action against a defendant for claims related to sexual abuse suffered while the plaintiff was under 18 years of age until the plaintiff attains 28 years of age."

**CAUSATION AND DAMAGES**

96.

Each of the foregoing acts and omissions constitutes an independent act of negligence on the part of Defendant, and one or more or all of the above stated acts were the proximate causes of the injuries and damages sustained by J.W.

97.

As a direct and proximate result of Defendant's acts and omissions J.W. suffered substantial physical, emotional, and psychological harm and other damages.

98.

Defendant is liable for J.W.'s damages: past, present, and future.

99.

Defendant is liable for J.W.'s damages in an amount to be proven at trial, including reasonable attorneys' fees under 18 U.S.C. § 1595(a) and punitive damages.

100.

J.W. brings each and every claim for damages permissible under the law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

a. actual damages;

b. direct damages;

c. personal injuries;

d. past, present, and future pain and suffering;

e. disability;

f. disfigurement;

g. mental anguish and emotional distress (until trial and in the future);

h. loss of the capacity for the enjoyment of life;

i. loss of earning capacity;

j. physical pain and suffering;

k. emotional impairment;

l. penalties;

m. lost wages;

n. diminished capacity to labor;

o. incidental expenses;

p. past, present, and future medical expenses;

q. pre- and post-judgment interest at the maximum legal rates;

r. permanent injuries;

s. attorney's fees;

t. punitive damages;

u. exemplary damages; and

v. consequential damages to be proven at trial.

## JURY TRIAL

101.

Plaintiff demands a jury trial on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against Defendant and for the following:

1) That process and summons issue requiring Defendant to appear as provided by law to answer the allegations of the Complaint;

2) Plaintiff be awarded actual damages in amounts to be shown at trial against Defendant;

3) Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

4) Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

5) Punitive damages be imposed upon Defendant;

6) Plaintiff be provided with a trial by jury; and

7) Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

This 28th day of September, 2026.

**THE STODDARD FIRM**


*/s/ Matthew B. Stoddard*
Matthew B. Stoddard, Esq.
North Carolina Bar No. 62220
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
F: 470-467-1300
matt@LegalHelpGa.com

***Attorney for Plaintiff***